JUSTICE LINN
 

 delivered the opinion of the court:
 

 Plaintiff-appellee, William O’Boyle, filed a complaint and a writ of certiorari
 
 [1]
 
 in the Cook County Circuit Court for review of an order of defendant-appellant, Personnel Board of the City of Chicago et al. (Personnel Board), finding him in violation of the city’s residency ordinance and suspending him for 60 days from his duties as a lieutenant with the Chicago Fire Department. The circuit court reversed the decision of the Personnel Board, holding that there were inadequate findings of fact to support the suspension and that the record did not justify a finding of nonresidency.
 

 On appeal, the Personnel Board claims that its finding that plaintiff violated the residency ordinance was not against the manifest weight of the evidence. We agree.
 

 We reverse the decision of the circuit court and affirm the decision of the Personnel Board.
 

 Facts
 

 Plaintiff, a Chicago fire department lieutenant since 1977, was charged by the fire department with violating the city’s residency ordinance, which requires that “[a]ll officers and employees in the classified career service of the city *** shall be actual residents of the city.” Municipal Code of Chicago, 1979, ch. 25, par. 25-30.
 

 Prior to September 1979, employees of the fire department against whom evidence of nonresidence was brought were given an undetermined period in which to comply with the ordinance by moving into the city. On August 15, 1979, the fire commissioner issued an order, stiffening the established policy:
 

 “Effective September 1, 1979, any member found in violation of the residency requirement of the City of Chicago and the Chicago Fire Department will be suspended by the Commissioner for thirty (30) days and charges will be filed with the Personnel Board of the City of Chicago seeking said members discharge.”
 

 The charges, issued against plaintiff on October 25, 1979, stated that “on or about September 18, 1979, he [plaintiff] was not an actual resident of the City.” The matter was heard before a board-appointed hearing officer on November 30, 1979. The hearing officer submitted a report of his findings and recommendations along with the transcript of proceedings of the hearing to the Personnel Board for a final decision. Included in the evidence before the Personnel Board was the following adduced testimony.
 

 Plaintiff testified that he has been married to his wife, Annette, since 1965. In 1972, the couple, as joint tenants, purchased a home in Palos Hills, Illinois. Plaintiff admitted to residing there with his wife and two children from 1972 to 1975. On May 10, 1976, a year after plaintiff allegedly moved out of his Palos Hills home and filed for legal separation, due to his wife’s refusal to move into the city, plaintiff’s third child was born. Annette and the three children continued to reside in Palos Hills, where the children attended school, until November 16, 1979, when plaintiff and his family moved into their new home at 9015 South Hamilton in Chicago.
 

 Annette O’Boyle testified that in September 1975, plaintiff asked her to move back into the city and that she refused to do so. Plaintiff filed for a legal separation, which Mrs. O’Boyle neither agreed to nor wanted. On September 21, 1976, a judgment was entered by the circuit court, permitting plaintiff to maintain a separate residence from his wife. The court did not, however, make any adjudication as to plaintiff’s'obligation for support because Annette had not filed a petition or complaint for separate maintenance or for support. Despite the absence of any such adjudication, plaintiff gave his wife approximately $700 to $750 each month, thereby providing the sole means of maintaining the Palos Hills home throughout the entire “separation” period. Mrs. O’Boyle testified that plaintiff gave her money “whatever-whenever” she needed it.
 

 Plaintiff testified that, upon leaving the Palos Hills home, he moved in with his parents at 7949 South Richmond in Chicago. Plaintiff’s father, Wilbert O’Boyle, testified that his son came to live with him in September 1975 because he “wanted a place to live in Chicago.” Mr. O’Boyle stated that plaintiff brought only his clothes when he moved in. When asked whether plaintiff visited his wife and children in Palos Hills during this period, Mr. O’Boyle stated that “all the time he [plaintiff lived with me he would go out there to see them,” on an average of once a week. Mr. O’Boyle testified that plaintiff stayed overnight on these occasions.
 

 Plaintiff testified that in July 1978, he was summoned by Captain James Ryan, director of internal affairs of the Chicago fire department. According to Captain Ryan, he met with plaintiff to inform him of the numerous residency complaints that had been lodged against him and to discuss his residency status. Plaintiff informed Captain Ryan that he had been seeing his family five or six times a month. When Captain Ryan admonished that the city requirements only permitted such visits twice a year, plaintiff declared that he was “going to see [his] kids.” He stated, “If I can see my kids seven days a week, I’m going to try to see them as much as I could.” Ryan informed plaintiff that if he wanted to continue to see his wife, she would have to move into the city, and he would have to sell the Palos Hills property. Ryan warned him that he could not have “dual residencies.”
 

 Plaintiff informed the hearing officer that in September 1977, he and his father purchased a building at 2535 West 59th Street in Chicago and that he moved into this building in July 1978. He maintained a second-floor, one-bedroom apartment in the building until he moved with his family into their new home in November 1979.
 

 Captain Ryan testified that during 1978 and 1979, he received numerous complaints concerning plaintiff’s residency status. In March and April of 1979, Ryan received between 10 and 15 complaints from the mayor’s office, the office of professional review and the fire commissioner’s office. By September 1979, Captain Ryan had received from 25 to 35 complaints about plaintiff’s residency. An investigation of plaintiff’s residence status ensued.
 

 Donald McGreal, an investigator with the internal affairs division of the Chicago fire department, conducted a surveillance of the Palos Hills Home. McGreal testified that he observed plaintiff exiting the Palos Hills residence at approximately 5:45 a.m. on four separate occasions, and at approximately 2:00 p.m. on a fifth occasion, during the months of March and April of 1979.
 

 Thomas Plant, an investigator from the office of budget and management, testified that in September 1979, he interviewed one woman who lived next door to plaintiff’s parents’ home and another who lived next door to the Palos Hills home. The former woman stated that plaintiff, who allegedly resided with his parents until July 1978, lived in Palos Hills. The latter woman identified plaintiff as her neighbor in Palos Hills.
 

 Further testimony included that of Annette O’Boyle, who stated that plaintiff did any painting and needed repairs on the Palos Hills home. She testified that her husband was in the aluminum business as a sideline and that he and his partner stored a lot of the material in the garage in Palos Hills. Plaintiff came frequently to Palos Hills during the summer of 1979 to pick up the material. She stated that in March and April of 1979, when she suffered headaches that lasted weeks at a time, plaintiff came to care for the children and spent the night on the average of twice a week. She admitted that from the time she and plaintiff purchased the Palos Hills home in 1972 until they sold it and moved in November 1979, the house expenses were totally paid by plaintiff, whose money also went to pay all utility, water and electricity bills.
 

 Plaintiff testified that from summer 1978 through May 1979, he was in Palos Hills “two and three times, four, five times a month.” He testified that in March and April of 1979 he started staying with his wife “more often” and that in May 1979, he and his wife reconciled and agreed to put their Palos Hills house up for sale. As of May 1979, plaintiff attempted to spend “as much as time as possible” with his children in light of the reconciliation, staying overnight two or three times a week. Plaintiff testified that from July 1978 until November 1979 he was “definitely out at Palos Hills” each Sunday to spend the day with his family.
 

 Captain Ryan testified that plaintiff had not taken possession of Chicago property nor transferred his children from Palos Hills to Chicago schools prior to September 1979. The department allowed plaintiff until the end of a 30-day extension, granted in August 1979, to buy a home in Chicago before charges for residency violation were brought. Plaintiff did not take possession of a Chicago home until mid-November 1979.
 

 In his written report to the Personnel Board, the hearing officer found that “while plaintiff presented substantial evidence establishing ownership and presences at a certain Chicago residence, there was more substantial evidence reflecting an actual residence in Palos Hills.”
 

 The Personnel Board, noting that its decision was based on the findings of the hearing officer and a review of the transcript of the proceedings, decided to retain plaintiff in his position as lieutenant but to suspend him for a period of 60 days.
 

 Plaintiff filed a petition for writ of certiorari and a three-count complaint. Count I of the complaint alleged that the Personnel Board’s decision was (i) against the manifest weight of the evidence; (ii) not based on legal standards properly stated and applied; and, (iii) not based on necessary findings of fact. In its order of October 6, 1982, the trial court reversed the decision of the Personnel Board as being contrary to the manifest weight of the evidence and remanded the cause for disposition in a manner consistent with the order. The court dismissed counts II and III as moot, and therefore those counts are not before this court. This appeal followed.
 

 Opinion
 

 This action for judicial review of an administrative decision was brought before the circuit court on a writ of certiorari. The proper standard for review of an agency decision in a certiorari proceeding, as set forth by this court in Caldbeck v. Chicago Park District (1981), 97 Ill. App. 3d 452, 458, 423 N.E.2d 230, 235, is as follows:
 

 “In a certiorari proceeding, the court must ascertain *** whether there is anything in the record which fairly tends to sustain the action of the agency. (Quinlan & Tyson, Inc. v. City of Evanston (1975), 25 Ill. App. 3d 879, 324 N.E.2d 65.) The reviewing court may not weigh the evidence or judge its probative value but rather only must determine whether the decision is supported by the evidence or is manifestly against the weight of the evidence. Kallas v. Board of Education (1973), 15 Ill. App. 3d 450, 304 N.E.2d 527.”
 

 The findings and conclusions of fact of the agency, charged with the primary responsibility of adjudication in a specialized area, are to be held prima facie true and correct. (General Electric Co. v. Illinois Fair Employment Practices Com. (1976), 38 Ill. App. 3d 967, 975-76, 349 N.E.2d 553, 560-61.) If the issue before the reviewing court is merely one of conflicting testimony and credibility of witnesses, the administrative board’s decision should be sustained. Keen v. Police Board (1979), 73 Ill. App. 3d 65, 70-71, 391 N.E.2d 190, 195.
 

 In order for a court of review to find that an agency’s decision is against the manifest weight of the evidence so as to justify substituting its judgment for the discretion of the board, the court must be able to conclude that “all reasonable and unbiased persons, acting within the limits prescribed by the law and drawing all inferences in support of the finding, would agree that the finding is erroneous,” (Daniels v. Police Board (1976), 37 Ill. App. 3d 1018, 1023, 349 N.E.2d 504, 508), and that the opposite conclusion is clearly evident. (Jenkins v. Universities Civil Service Merit Board (1982), 106 Ill. App. 3d 215, 219, 435 N.E.2d 804, 807.) That an opposite conclusion might be reasonable or that the court might have reached a different conclusion is not adequate to set aside the agency’s decision. Knop v. Department of Registration & Education (1981), 96 Ill. App. 3d 1067,1075-76, 421 N.E.2d 1091,1097.
 

 In short, if there is anything in the record which fairly supports the action of the agency, the decision is not against the manifest weight of the evidence and must be sustained on judicial review. (Caldbeck v. Chicago Park District (1981), 97 Ill. App. 3d 452, 458, 423 N.E.2d 230, 235.) Here, defendant argues on appeal that the action taken by the Personnel Board was not against the manifest weight of the evidence. We agree.
 

 In the statement of charges filed by the Personnel Board on October 24, 1979, plaintiff was charged with violating chapter 25, section 30 of the city’s Municipal Code “in that on or about September 18, 1979, he was not an actual resident of the City of Chicago.” The decision of the Personnel Board sustaining the charges was made on March 19, 1980. The order of the trial court reversing the board’s decision was entered on October 6, 1982. Since the rendering of these decisions, our supreme court has interpreted the term “actual resident” as used in the context of chapter 25, section 30 of the municipal code:
 

 “We consider that in the context here ‘residence’ was intended to be synonymous with domicile, which has been defined as ‘the place where a person lives and has his true, permanent home, to which, whenever he is absent, he has an intention of returning.’ Peirce v. Peirce (1942), 379 Ill. 185, 192.”
 

 (Fagiano v. Police Board (1983), 98 Ill. 2d 277, 283.)
 

 “[T]he issue to be decided by a board is principally of determining the employee’s intent.”
 

 (Fagiano v. Police Board (1983), 98 Ill. 2d 277, 287.) In light of this clarification, we must turn to the applicable law governing domicile to determine whether the Personnel Board’s decision is supported by evidence which shows that plaintiff was not domiciled in the city as of September 19,1979.
 

 A person may never have more than one domicile (Miller v. Police Board (1976), 38 Ill. App. 3d 894, 898, 349 N.E.2d 544, 548); once established, a domicile continues until a new one is acquired. (Stein v. County Board (1967), 85 Ill. App. 2d 251, 257, 229 N.E.2d 165, 168, affirmed (1968), 40 Ill. 2d 477, 240 N.E.2d 668.) It is evident and undisputed that plaintiff was domiciled with his wife and children in their Palos Hills home from 1972 through 1975. The issue, then, is whether plaintiff acquired a new domicile at any time after 1975 and prior to September 19,1979.
 

 An essential element in the acquisition of a new domicile is the abandonment of the former domicile. (In re Estate of Jackson (1977), 48 Ill. App. 3d 1035, 1037, 363 N.E.2d 919, 921.) In Illinois, affirmative acts of abandonment of the former domicile must be proved to sustain the abandonment required to effect a change of domicile. (Rosenshine v. Rosenshine (1978), 60 Ill. App. 3d 514, 517, 377 N.E.2d 132, 135.) There must be an actual abandonment of the first with an intent not to return to it, and a new domicile acquired with the intent of making it a true and permanent home. (Coronet Insurance Co. v. Jones (1977), 45 Ill. App. 3d 232, 237, 359 N.E.2d 768, 772.) The burden of proof of a person’s intent to change his domicile rests on the party seeking to prove change of domicile. In re Estate of Jackson (1977), 48 Ill. App. 3d 1035, 1037, 363 N.E.2d 919, 921.
 

 In the landmark case of Kreitz v. Behrensmeyer, our supreme court set forth the considerations to be taken into account when determining if a party has acquired a new domicile:
 

 “We have frequently held, that when a party leaves his residence, or acquires a new one, it is the intention with which he does so that is to control. Hence the shortest absence, if at the time intended as a permanent abandonment, is sufficient, although the party may soon afterwards change his intention; while, on the other hand, an absence for months, or even years, if all the while intended as a mere temporary absence for some temporary purpose, to be followed by a resumption of the former residence, will not be an abandonment. On the question of intention, the declaration of the party, though admissible, is not necessarily conclusive, because it may be disproved by his acts, — as thus: If a party were to remove his family to a particular district, there build and furnish them a home, keep his property there, return there constantly, as leisure allowed, and remain there with his family during sickness and unemployed time, this would constitute his residence, notwithstanding he might be employed in labor in another district, and claim that to be his residence, (The People v. Holden, 28 Cal. 124,) for, on questions of domicile, less weight is given to the party’s declarations than to his acts.” (Kreitz v. Behrensmeyer (1888), 125 Ill. 141, 195,17 N.E. 232, 253.)
 

 In a modernized, more succient form, the Restatement (Second) of Conflict of Laws sec. 18, comment g (1971), states that “[t]he primary intention required for the acquisition of a' domicile of choice is an intention to make a home rather than an intention to acquire a domicile.”
 

 The intent required to effect a change of domicile is typically absent in cases such as the instant case where civilian public employees change residence merely to comply with employment demands.
 

 “Generally, a change of residence occasioned by the exercise of duties in connection with holding a public office or being employed in the governmental civilian service does not bring about a change of domicil in the absence of a concurrent intention to abandon the old domicil and acquire a new one. In other words, one who resides at a place for the purpose of carrying out his public duties does not thereby acquire a new domicil or lose the domicil which he had before undertaking such duties.” (Annot., 129 A.L.R. 1382, 1392 (1940).)
 

 “[I]n the absence of an intention to make a change of domicil independently of the fact of public service.” (Annot., 129 A.L.R. 1382, 1401 (1940).
 

 Whether a party has abandoned one domicile and acquired a new one is a question of fact. (Rosenshine v. Rosenshine (1978), 60 Ill. App. 3d 514, 517, 377 N.E.2d 132, 135.) As previously noted, the agency’s findings of fact are to be held prima facie true and correct.
 

 The issue in the instant case, then, necessarily becomes whether the record before the Personnel Board contained any evidence to support the finding that plaintiff had not abandoned his Palos Hills domicile and had, therefore, not acquired a new domicile in the city. The board could so find, if plaintiff failed to prove that he moved to the apartment in the city with the intent to. make it his permanent home rather than with the intent to satisfy the residency requirement.
 

 Our review of the record, as highlighted by the relevant testimony set forth above, leads us to conclude that the Personnel Board had before it sufficient evidence to support this finding. Moreover, it is clear from the transcript of the trial court proceedings that the trial judge reached the same conclusion as the Personnel Board on the issue of plaintiff’s intent, namely, that plaintiff’s intent was to comply with the residency ordinance. This is apparent from the trial judge’s statement:
 

 “*** [A]s the Illinois Supreme Court and other courts have held in a great number of cases, that the question of residency is largely a question of intent.
 

 And there’s absolutely no findings of fact.
 

 I don’t criticize the hearing officer in this case because I don’t think that they could make findings of fact in this record relating to O’Boyle’s intent. Because it’s clear, in my judgment, in this record O’Boyle’s intent was to comply with the obscured ordinance relating to residency in the City of Chicago.”
 

 Having thus correctly discerned plaintiff’s intent, the exact intent which prohibits a person from acquiring a new domicile and which supports the action of the Personnel Board, the trial judge rather enigmatically reversed the agency’s decision.
 

 What was “clear” to the trial court judge was undoubtedly also clear to the Personnel Board and remains equally clear to this appellate court. That the board’s decision was not supported by detailed factual findings, as plaintiff contends, in no way clouds this clarity. There is no statutory requirement for detailed and specific findings of fact by an administrative agency. (Suttle v. Police Board (1973), 11 Ill. App. 3d 576, 579, 297 N.E.2d 174, 176.) Where the testimony before the administrative agency is preserved for review in the record, specific findings of fact by the agency are not necessary for judicial review. Massey v. Fire & Police Com. (1960), 26 Ill. App. 2d 147, 149-50, 167 N.E.2d 810, 812.
 

 Also without merit is plaintiff’s second argument in which he suggests that the trial court could have reversed the decision of the Personnel Board based on the invalidation of the residency ordinance in the case Bastian v. Personnel Board (1982), 108 Ill. App. 3d 672, 439 N.E.2d 142. Plaintiff’s argument is rendered nugatory by our supreme court’s finding that the residency ordinance is not unconstitutional and its subsequent vacation of Bastían in the consolidated case of Fagiano v. Police Board (1983), 98 Ill. 2d 277.
 

 For the reasons set forth, we reverse the decision of the trial court and reinstate the decision of the Personnel Board.
 

 Trial court reversed, Personnel Board decision reinstated.
 

 ROMITI, P.J., and JOHNSON, J., concur.
 

 [1]
 

 As this matter came before the Personnel Board, judicial review cannot be sought pursuant to the Administrative Review Act, and a petition for a writ of certiorari is proper. Meylor v. Boys (1981), 101 Ill. App. 3d 148, 150, 427 N.E.2d 1023, 1024-25.